In both of these cases Mr. Schroeder was deprived of his most critical evidence for these two trials. When the trial court denied funding for and then the testimony of the eyewitness identification expert and this was in violation of the due process clause. In both cases the prosecution's case hinged on the eyewitness testimony of the victims. In both cases there was no forensic evidence linking Mr. Schroeder to the scene and there was no other evidence linking Mr. Schroeder to the scene. Eyewitness testimony was it. The defense was misidentification and guilt was not overwhelming. In one of the trials the verdict was 11-1. So there's a, Dr. Hawkins would have testified about the issues and I can go through for each trial what the three for the Brumley trial he would have been able to testify that it's possible that Ms. Brumley had a memory error that unconscious transference whereby because she saw the newspaper article within a week of identifying him it made it likely that she misidentified him. Especially when you compound that with the lengthy amount of time. It was a year and seven months between the crime and when she identified him. And then the fact that scientific evidence shows that our memories decline to a severe magnitude. Dr. Hawkins didn't testify to what percentage but he did say he could have testified to the percentages by which our memory ability declines with time. And then he also could have testified that contrary to common sense and the prosecution's arguments the traumatic incident that happened to Ms. Brumley actually decreased the assailant's face a year and seven months later and then by the time of trial two years later. So then we've got the other case. I don't know if you want me to switch. Well, unless there's something unique about the facts. But isn't the problem here the one that Judge Bea already alluded to in the prior case? Which is you're under AEDPA and you have to establish that the law. That is correct. Is clearly established. And that there was an unreasonable application or that it was what the state court did was contrary to. There are two points here. First is that it doesn't appear that the trial court understood the due process argument whatsoever. It seemed to only focus on the  process. Let me just make sure I understand this. At the time, wasn't there some state court of appeal opinion that said this evidence was not admissible? That's not exactly. It was State v. CALEA. It didn't exactly state that. It was a different type of evidence. Some sort of unusual Proustian deja vu expert that does not appear to have had any scientific validity according to the court and CALEA that the defense was trying to have funding for and testimony of. And in like both of these trials, the trial court was willing to and did in fact instruct the jury about factors that affect the reliability of the witness' recollection abilities. And that did not happen here. Because here it looked like, as you just said, the trial court excluded this evidence basically as a state evidentiary matter. Yes. Right? Correct. It did go up to the state court of appeal, though. Yes, it did. And what did they say? They also made . . . So what makes this . . . I mean, you need to really address Judge Bea's concern. What makes this so clearly established that we can look to point to a decision of the United States Supreme Court? It's our position that it's the rare circumstance that there's an exact Supreme Court case about this particular witness or that particular witness. Didn't we have a case called Jackson v. Ilst in the Ninth Circuit, 1990, which said that there was no Federal right to fund eyewitness expert testimony? I have a note on that. Have you ever heard of that case? I'm sorry, Your Honor, I have not. I can look into it and . . . It's a pre-AEDPA case. And it was also . . . It doesn't make any difference. I could prepare a memo about that and submit it with the next case. Well, Judge Pius points out it's pre-AEDPA. But even, you know, apart from the Ninth Circuit case, you still need to point this to some United States Supreme Court case. We could say, you know, at the time the Court of Appeal or the State Supreme Court considered this issue on direct appeal, clearly established . . . That we're looking . . . You're saying I need to point to a Supreme Court case saying that eyewitness identification experts are required, and I cannot  . . . So doesn't that basically foreclose that argument under AEDPA? It is our belief and argument that it does not, and that I'm trying to find a case that I have in my head, but I can't remember the details. There's a case where this Court actually stated that it doesn't have to have the exact same factual scenario in order to be clearly established Supreme Court precedent, and that case, I wish I could remember the name right now. They believe it's in my brief, but it talked about that it's the concepts behind it. And that's why I talked about Aki earlier, is that while Aki was decided later, Aki talks about that this is not a new opinion. This is all about how, as the Court said, meaningful access to justice has been our consistent theme. Mere access to the courthouse doesn't by itself assure the proper functioning of the adversarial process. And it goes on to say that if an indigent defendant does not have access to the raw materials that are integral to building an effective defense, then we don't have meaningful access to justice. And that's the general principle, is the access to justice and due process rights to be put at the same level as the prosecution. And what it looks like the trial court did, and the direct appeal ignored this issue, the opinion ignored this issue, so we're stuck with what the trial court said. So the trial court seems to have believed . . . he made some comments about how we don't need to put an indigent defense in the same position as a wealthy defendant, kind of like the OJ Simpson defense versus an indigent defense. Obviously, this was pre-OJ. That's fresh in my mind since he got released yesterday. Now, help me out on what actually occurred here. First, the Court denied funding. Yes. It's rather complex. And then, somehow or another, this witness, without funding with public money, came up as a potential witness. And it wasn't money that was involved. It was the issue of the admissibility of this expert's testimony that caused the Court to reject the evidence. So doesn't the failure to fund kind of justify or at least was ready to testify, right? It's a little confusing and not clear from the record below. But what appears occurred in one of the trials, I believe it was the second trial, the defense discussed that Mr. . . . I'm sorry, Dr. Hawkins, if I could just get a sip of water. Go ahead. Thank you. So in terms of timing, they did have the first trial, they tried to have the expert funding issue. And the prosecution made a big hoopla about $500 being too much. And the trial court talked about CALEA, talked about denying. The trial court, that trial court, then gave permission for this issue to be And at that point, the defense attorney, Mr. Halpern, who's a different defense attorney than the third trial, he had Ms. . . . Dr. Hawkins actually testified that he was willing to come in and discuss these issues without getting paid . . . he actually said he was willing to spend some time working on this without a guarantee of funding with defense counsel personally liable for the costs associated because he was assuming that the court would grant it. And so the defense attorney, and this is getting directly to what you were talking about, the problem is the defense attorney told him to, quote, not spend any substantial amount of time delving into the cases unless the funding was approved. So their proffers kept on being limited by the denial of funding. Had the funding been provided, it could have been two things. One, obviously the testimony, but it also assists the defense attorney in noticing discrepancies that the defense attorney might not already know about in terms of eyewitness . . . the ones that, contrary to common sense, we all seem to believe that if someone says they're 100 percent right, 100 percent accurate, that that's true and the converse is true. And even if the defense attorney wouldn't have been able to get in the expert  literature and introduce that under the evidence code. But if you're correct that this is a constitutionally guaranteed right, what distinguishes this case from any rape case, any robbery case, or any other emotionally charged event? We're going to have experts on eyewitness accounts in every case. What distinguishes this case from any of the hundreds of cases that are presented in any given year? For both of these trials, there was no forensic evidence linking Mr. Schroeder to the crime and there was no other evidence. These cases are very different than the first case we talked about earlier because there's no DNA, there's no definitive scientific evidence linking him, there's no cheese bite mark evidence linking him, there's no possessions that he supposedly stole. Nothing linked him except the testimony. So our position is when the testimony alone is the linchpin for the prosecution's case, then an eyewitness identification expert should be allowed. So you're arguing, if you're correct, on the law, that a defendant who has any scientific evidence against him would then be deprived of the right to do what you're arguing that this defendant should have been able to do? No, I believe in our position for this case obviously is different than what I believe should happen on every case. As a defense attorney, I believe we should be able to have witnesses like this. And as we all know, with what's happening in science, we're learning more and more about the fallibility of eyewitness testimony. There was actually a Supreme Court case in, I believe it was 1973, that talked about that, where the Supreme Court actually said, and I made a reference to it in my brief, one of the three briefs for these three cases, actually pointed out, juries have a tendency to rely too much on eyewitness testimony. And we all know that there are problems with eyewitness testimony. And then, as we have the evolving norms, obviously we've gotten to a point today where this is customarily happening in defense requests and in the testimony, which is where a lot of the more recent case laws stemming from. But as a defense attorney, that's not necessarily what the defense is going to be about. There are going to be cases where there's scientific evidence, where I have my expert battling the prosecution's expert. And there are going to be situations where we have other evidence that's non-scientific that can show an alibi defense. There's all sorts of other topics. I don't know if I picked up correctly your answer to Judge Levy's question. I thought that an independent ground for rejecting Dr. Hawkins as a witness was that the Oregon evidentiary law did not allow expert testimony as to eyewitness testimony. Isn't that so? No. What the evidence code, I don't have it directly in front of me, but the evidence code essentially says that one witness cannot comment on the truthfulness of the other. I wish I had the language in front of me. One of the things that the expert was going to talk about is the scientific evidence, so he could give hypos. I think it was the second trial that the defense during trial did an offer of proof about this and used the hypothetical. So if there was a lapse of one year and seven months between the ID, how would that affect, what does science show that that would affect the rate of accuracy? And the defense attorney could have asked those types of questions if the court was troubled by the direct statements, like if the defense had had Dr. Hawkins say, for instance, that in the Bowen case, I'll stick with Brumley, where she saw the newspaper article. So it's nuanced. So maybe she could not, I'm sorry, let me backtrack. I'm getting all these cases confused. I think what you're saying is that Oregon law says one witness can't have a conclusion or an opinion that another witness is not telling the truth or is not being accurate. Correct. But, and that was a rule that was applied in the trial court to bar Dr. Hawkins? In part. What was the other part? The CALEA decision. Right. And so what we're saying is that if the trial court was troubled by direct testimony, like when Ms. Brumley identified Mr. Schroeder after seeing his newspaper photo a week earlier, that was unconscious transference and it's not reliable. Instead, he could say if a person saw a large photo of a person the next day, and then a year and a half or more had passed, the likelihood of that person's memory being accurate is decreased by X percentage. And the doctor told, the trial court judge actually asked about the percentages and seemed very intrigued by the idea that the expert could testify at percentages of accuracy. And while there's not testimony of what the exact percentages are for each of these scenarios, I submit that that's because of the funding issue that he was told not to delve deeply into those. So I feel like what happened is that the trial court looked at it very briefly, like open, shut. The evidence code says you can't comment and didn't look into this nuanced concept that he could reply to hypotheticals, that it's also like any other scientific evidence. I mean, we have all the time where witnesses come up in a traffic accident and one witness says, he re-rendered me. The other says that didn't happen. And then you have a crime scene reconstruction expert who comes in and testifies about scientific evidence shows that in this scenario, if this person was going 45 miles per hour and this would happen and they give information. And this is just another piece of science. The other part that seemed to be happening in this case is that the trial court seemed to be skeptical of psychological testimony in general and didn't seem to believe that it was scientific. And it's our position that it was. Did you want to say anything about the eyewitness identification itself by Bromley and Bowman? Yes. Switching back to, cause we haven't talked about Bowen. The pretrial, you know, the, the lineup and then the identification in court. Yeah. For Ms. Bowen, we've got Bowen and Cummins. Bowen was the victim. Cummins was the cleaning lady. There was a delay of eight months. The Supreme Court has said in Neal that a delay of seven months is a severely hamper, severely troubling to the court. And so because Neal, seven months, eight months for Bowen, a year and seven months for Bromley, that evidence should have been looked at more closely. And then we have the issues of the contamination with the seeing the photos in the newspaper. And for Ms. Bowen, the detective Richardson was involved with the investigation of all of these crimes and scientific studies revealed that even in the best of intentions, we give out unconscious signals of who to pick. So what were the signals that he suggested to either Bowman or Bromley? Unfortunately, the record is completely absent in that regard. We know that it was, it was a detective Mindy Richardson for both cases. We also know that for Ms. Bromley's case, she was told by the police that they'd like to show her some photos and see if anyone looked familiar. And that's the troubling part is if anyone looked, not if this was your assailant and because she'd just seen those newspaper articles, she subscribed to the Oregonian. She got it at her house and she testified that she had seen the photo. She testified that she'd seen the map that showed her address as one of the crime victims. So when he says, does anyone look familiar? Of course she said that he did because she'd seen his photo a week before. And I'm going to save any remaining time. All right. Thank you. Thank you. We'll hear from the state. May it please the court. Susan York. I'll start first with the expert witness issue. Petitioner asserts that the exclusion of expert testimony regarding the reliability of eyewitness identification violated his due process rights. When there's no forensic testimony. So actually in the Brumley case, there was other evidence. There was evidence matching that the, and blood type a secretor was the assailant and that petitioner was blood type a. Um, there was also evidence that there was some hair evidence that hair found at the Brumley crime scene matched petitioner. Um, and there was also clothing evidence that he had clothing that was similar to that clothing evidence that clothing found in petitioner's possession was similar to that described by the victim. Um, and with the second case, the Boeing case, there wasn't that scientific evidence, but there was clothing evidence that the, he was found with a mask and the victim had described him wearing a similar mask. And also in that case, there were two separate eyewitness identifications, one from the victim and one from the apartment manager who had had a 32nd to two minute conversation with petitioner and specifically took note of him. Um, and was able to successfully identify him both from a photo lineup and at trial. So turning back to the expert issue here, no Supreme court case in existence at the time of the state court decision here required admission of expert testimony about the reliability of eyewitness identifications. And to the contrary, at the time of the state court decision here, this court had repeatedly affirmed the exclusion of expert testimony regarding eyewitness reliability. And I would point the court to USV Amaral. That's 488 F2D 1148 and USV Sims 617 F2D, 1371. Um, and the idea is sort of in all of these cases was that cross-examination is the way you test the reliability of a witness and that the jury is capable of assessing eyewitness credibility. Um, that was sort of the overwhelming sense in these cases. The ninth circuit had observed that expert testimony on eyewitness reliability was strongly disfavored by most courts at the time. Um, and in Amaral, this court said that our legal system places primary reliance for the ascertainment of truth on the test of cross-examination. Under Oregon law at the time, the judge made the ruling, did it preclude admission of state? Did he have some discretion that he could have let it in? State v. Calia is a little bit unclear on that point. Um, at issue there was the court had excluded the testimony and in state v. Appeals said the exclusion of eyewitness testimony was not error. But so that suggests maybe there's some discretion, but actually in analyzing the issue, the court says that eyewitness credibility is the province of the jury. Um, and suggest that this type of testimony is simply not helpful to the jury. Um, and sort of invades in their classic role as the, the finders of credibility, determiners of credibility. So there's no Supreme court case, um, establishing that due process requires expert testimony. And even if you turn to this sort of more general rule about the ability to present a defense, the test there under EDPA is that relief is available under 2254 D 1's unreasonable application clause. If and only if it is so obvious that a clearly established rule applies to a given set of facts that there could be no fair minded disagreement on the question. And that's the Supreme court in white v. Woodall. And so the more general the rule, the more latitude a state court has in applying it. So if the rule is that sort of a petitioner has an ability to prevent or present a defense and needs to be able to present any evidence that's critical and vital to his defense, that's a very general rule and there's, and there's been no showing that this evidence was critical and vital. And indeed this court's decisions at the time, as well as the state court's decisions at the time, suggest that expert testimony on this issue is not even really particularly helpful. I gather there was extensive cross-examination on the correct eyewitness identification. That's correct. And if the court has no questions on venue or on the eyewitness identifications, I would on the on the denial of the motions in each case for a change of venue, the appellate court relied heavily on the testimony or the, jury selection process. And what came out of that now in one or the other or both of these cases, that transcript has been lost or destroyed. Is that right? In one of the cases, it appears that the voir dire was never transcribed, never transcribed. That's correct. And, okay. You w and you're, you're saying you're certain of that or you don't know. That's my understanding from the record. I think that's the best reading of the record was that it was never transcribed, never, but it was reported. I'm not sure that that is clear from the record. I would assume that it was recorded, but I, I don't think it's clear from the record exactly what happened there. Well, it strikes me that the appellate court relied pretty heavily on that in, in the, in at least, well, in at least one of the cases, right? So there's no published opinion in the case where voir dire was not recorded. The published opinion from the Oregon court of appeals is in 15, three, five, nine, six, six. And voir dire was recorded in that case. So the, the court of appeals opinion in 15 dash three, five, nine, six, five, was basically an affirmance without opinion. I think they cited the prior Schroeder case. So the analysis of the voir dire was in the case in which the voir dire was transcribed. But even in the case where the voir dire was not transcribed, we have some good reasons to believe that the jury wasn't actually biased. One of those things is that defense counsel's closing in that case, he's talking about how all the jurors had said that they could be impartial, which suggests that they had a voir dire and that every juror was seated who was seated, stated that they could be impartial, which is what is required under the constitution. Ignorance of the facts of the case is not required. Just an ability to be impartial is what is required. So that suggests that all the jurors did indicate that they could be impartial. It's also probably petitioners responsibility to provide a record on which this claim can be assessed. And to the extent that petitioner faults, for example, his appellate counsel in his direct appeal for failing to obtain a transcript of voir dire, that would need to be raised as an ineffective assistance of appellate counsel claim, which is not before this court. But the ruling at the time it's made on the change of venue pre-trial has to be correct. Can you bail out an erroneous decision based on voir dire? I think the ruling here was correct. So what do we, what should we be focused on? Should we be focused on and was the state court correct in focusing on voir dire as opposed to what was before the court at the time it made its ruling on change the evidence of pre-trial publicity? The court should have been focused on the evidence of the pre-trial publicity and what was presented at the hearing on the change of venue motion. And that was sort of the critical evidence in assessing whether to grant the change of venue. That's the constitutional issue that we have in front of us on the change of venue, is it not? Correct. It's not enough to say, well, it's okay for the state court to say, well, we don't know whether that decision on change of venue was right or not. But now that we've heard the voir dire or read the voir dire, we know it's okay. Is that legitimate? So I think there's sort of two separate questions with a change of venue claim regarding due process. And one is whether the pre-trial publicity is so adverse that prejudice is presumed. And in that case, if, if the pre-trial publicity is so extensive, and this is the Rudeau case, it's a 20 minute confession aired repeatedly. Then prejudice is presumed and the change of venue motion needed to be granted because the petitioner couldn't have obtained a fair trial. But there's another question, which is whether there was actual prejudice. And under that test, it's petitioner's burden to show that he was actually prejudiced by the denial of the change of venue motion. And it's there that the voir dire transcripts potentially become relevant. They're available in the one case and they indicate that it was quite easy to draw an unbiased jury from the veneer. They're not available in the other case. That's petitioner's burden. It's his burden to show actual prejudice. And he has not done so here. So the rulings were correct all the way along. The trial court was correct. The court of appeals was correct. The published opinion relates to the case where voir dire was transcribed. And that's why there's so much discussion of voir dire under the actual prejudice analysis. What was the extent of the pretrial publicity? It was, there's testimony that it was similar to publicity in other major cases. What we have in the record are some articles from the register guard, which had a circulation of about 60,000 people in a population of 275,000,  which was a pretty high profile crime, but it was the type of publicity that's standard basically for a major crime. Petitioner really takes issue really with statements that appeared in two particular articles relating to the possibility that petitioner would raise a mental health defense and petitioner attempts to analogize those to the publicity in Rodeau, which was again, a 20 minute video of a confession. But it's worth pointing out that the mentions of the possibility that petitioner would raise a mental health defense were in the body of the articles, not in the headline. And the one that discusses it most is in an article where the headline is, rape suspect pleads innocent. So there really was no grave suggestion that petitioner was guilty through that, those two mentions of the possibility of a mental health defense. And certainly reasonable jurists could disagree as to whether those two mentions in the body of articles were similar to a 20 minute confession that was videotaped and aired. Wasn't the mention of a mental defense in the context of a motion by the defense attorney to delay matters for 30 days in order to determine whether a mental defense would be, would be pleaded or not. So there wasn't a mention that there was a mental defense. Correct. That's correct. So the court has no further questions. We would ask that the court affirm. Thank you. Okay. Briefly with regard to the venue, the state's appellate brief actually called this a media event. His arrest was a media event and unusual media event. I would put forth if you look through all of the evidence that we've put with all of the enlarged photos, I think it was eight and a half by eight and a half front page and the other items that are in the pleadings. And then with regard to the second trial that was not transcribed with the voir dire Schroeder extensively discussed that in his PCR case and he complained about how his appellate attorney refused to get that transcribed and that he was, he was aware, Schroeder was aware that this was essential to prove his case. Schroeder was constantly trying to get all of his attorneys to do their jobs. It seems that the attorneys were overwhelmed by how complex these cases were with regard to the forensic issues. Uh, contrary to what council represented earlier, the case number Brumley case, the fingerprints did not match Schroeder and the seminal fluid found was not conclusive. There was no evidence linking Schroeder. And the same is true for the Bowen matter. The evidence showed that their tissue paper with semen and saliva was type O, which was the victim's type, not type a, which was Schroeder's. The criminal speculated that that may be to, to dilution, but he could not definitively link Schroeder in any way. Okay. And finally, I want to remind your honor that this is a cumulative error issue for all of these cases. So even if one of these individually does not rise to the level necessary, all of these factors together resulted in Mr. Schroeder being deprived of due process right to a fair trial. He had attorneys who weren't doing their jobs, attorneys who weren't prepared for trial. He was lacked the means with which to do his job. And as a result, the jury relied on eyewitness identification that if we were to have this case today, certainly would not be found by scientific evidence to be valid. And for those reasons and the reasons in my briefing on all of these cases, we asked that the court reverse. Thank you. Thank you counsel. We, um, we appreciate your arguments in the briefing, both sides. Well done. Thank you.
judges: Leavy, Paez, Bea